UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT FREEDMAN, Individually and on Behalf of All Others Similarly Situated, | : : : | Case No. |
| Plaintiff, | : : : | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF** |
| v. | : : : | **SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| AETNA, INC., MARK T. BERTOLINI, ELLEN M. HANCOCK, FRANK M. CLARK, EDWARD J. LUDWIG, JEFFREY E. GARTEN, FERNANDO AGUIRRE, MOLLY J. COYE, RICHARD J. HARRINGTON, JOSEPH P. NEWHOUSE, ROGER N. FARAH, AND OLYMPIA J. SNOWE, | : : : : : : : : | **JURY TRIAL DEMANDED** |
| Defendants. | : : | |

Plaintiff Robert Freedman, by and through his undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, his counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Aetna, Inc. ("Aetna" or the "Company") and CVS Health Corporation ("CVS") with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning Aetna; and (e) consultations with financial experts.

## NATURE OF THE ACTION

1.      This action is brought by Plaintiff on behalf of himself and on behalf of all other similarly situated public common stockholders of Aetna against the Company and against Mark T. Bertolini, Ellen M. Hancock, Frank M. Clark, Edward J. Ludwig, Jeffrey E. Garten, Fernando Aguirre, Molly J. Coye, Richard J. Harrington, Joseph P. Newhouse, Roger N. Farah, and Olympia J. Snowe, all of whom are members of Aetna's board of directors (collectively referred to as the "Individual Defendants"), for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9 in connection with the proposed acquisition of Aetna by CVS through a merger transaction ("Proposed Transaction").

2.      On December 3, 2017, Aetna and CVS issued a joint press release announcing the entry into an Agreement and Plan of Merger (the "Merger Agreement") by and among the Company, CVS, and Hudson Merger Sub Corp. ("Merger Sub"), a wholly owned subsidiary of CVS.  Pursuant to the terms of the Merger Agreement, Merger Sub will merge with and into the Company, with Aetna continuing as the surviving corporation and a wholly-owned subsidiary of CVS.  Upon completion of the merger, Aetna will no longer be a publicly traded corporation.

3.      According to the terms of the Merger Agreement, each share of Aetna's public common stock will be converted into the right to receive (i) 0.8378 (the "Exchange Ratio") fully paid and non-assessable shares of CVS Common Stock (the "Share Consideration") and (ii) $145.00 in cash without interest thereon (the "Cash Consideration" and, together with the Share Consideration, the "Merger Consideration"), which values Aetna at approximately $207.94 per share based on the December 1, 2017 closing price of CVS ($75.12).  The Proposed Transaction

2

is valued at approximately $77 billion, including debt.   At least three analysts – from Oppenheimer, Piper Jaffray, and J.P. Morgan – have issued reports stating their belief that the deal price is low, stating, *inter alia,* that "Aetna was in the driver's seat and should have received a higher premium," Aetna shareholders should have gotten "heavier cash and a higher price point," and the $207 per share takeover price "may be viewed as insufficient by some AET shareholders given a possible 24% EPS benefit to AET from tax reform."

4.      On January 4, 2018, the Company filed with the SEC a Form S-4 Registration Statement (the "S-4").  Plaintiff alleges that the S-4 was filed in violation of Sections 14(a) and 20(a) of the Exchange Act in order to convince Aetna's shareholders to vote in favor of the Proposed Transaction.

5.      The S-4 misstates and/or omits material information concerning the Proposed Transaction.  As detailed herein, the S-4 omits material information regarding the background of the Proposed Transaction and key inputs and assumptions used by Aetna's financial advisors in providing their fairness opinions, including analysis of the premiums paid in precedent industry transactions and the amount of expected synergies used in the banker's analysis to anticipate the benefits to be realized from the Proposed Transaction.   Without this information, Aetna's stockholders cannot make an informed decision on whether to vote their shares in favor of the Proposed Transaction.   Moreover, it appears that both of Aetna's financial advisors worked together and relied on the same inputs and assumptions; accordingly, investors such as Plaintiff are not benefitting from two independent analyses and fairness opinions.

6.      The special meeting of Aetna stockholders to vote on the Proposed Transaction is expected to be held during the second half of 2018.  It is imperative that the material information that has been omitted from the S-4 is disclosed to the Company's stockholders prior to the

shareholder vote so that shareholders can properly exercise their corporate suffrage rights. Additionally, based on various public sources and an evaluation of the statements made in the S-4, including in the portions relating to the fairness opinions provided to Aetna and its Board of Directors (the "Board"), it appears that the proposed Merger Consideration is inadequate and does not fully reflect the fair value of Aetna.

7.      For these reasons, and as detailed herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the omitted material information discussed below is disclosed to Aetna's stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## PARTIES

8.      Plaintiff is, and has been at all relevant times, a stockholder of Aetna common stock, as reflected in the attached Certification filed with Complaint.

9.      Defendant Aetna is a public company incorporated in the Commonwealth of Pennsylvania. Its common stock trades on the New York Stock Exchange ("NYSE") under the symbol "AET". Together with its subsidiaries, the Company operates as a healthcare benefits company in the United States, and represents in its SEC filings that it serves an estimated 44.6 million people. Aetna offers a broad range of traditional, voluntary and consumer-directed health insurance products and related services, including medical, pharmacy, dental, behavioral health, group life and disability plans, medical management capabilities, Medicaid health care management services, Medicare Advantage and Medicare supplement plans, workers'

4

compensation administrative services and health information technology products and services. Aetna's customers include employer groups, individuals, college students, part-time and hourly workers, health plans, health care providers, governmental units, government-sponsored plans, labor groups and expatriates.

10.     Mark T. Bertolini is, and has been since 2010, a director of the Company and currently serves as the Chairman and Chief Executive Officer of the Company.  He is the Chairman of the Executive Committee and a member of the Investment and Finance Committee of the Board of Directors.  The Proposed Transaction, if consummated, would provide Mr. Bertolini (along with certain other directors and officers of the Company) with significant benefits that are not available to Plaintiff and the other members of the Class.  According to data compiled by *Bloomberg*, Mr. Bertolini holds equity awards valued at $71.9 million at the $207 Merger Consideration that would vest immediately if he is terminated within two years of a transaction.  Mr. Bertolini is also entitled to approximately $6.72 million in severance and, as of December 31, 2017, he had accumulated $9.72 million in deferred compensation and pension. Thus, Mr. Bertolini could leave with $88 million if the Proposed Transaction is consummated.

11.     Ellen M. Hancock is, and has been since 1995, a director of the Company. She is a member of the Audit Committee, the Executive Committee and the Chair of the Nominating and Corporate Governance Committee.

12.     Frank M. Clark is, and has been since 2006, a director of the Company.  He is a member of the Compensation and Talent Management Committee and the Nominating and Corporate Governance Committee.

13.     Edward J. Ludwig is, and has been since 2003, a director of the Company and currently serves as the Lead Independent Director of the Company.  Ludwig is also a member of

Compensation and Talent Management Committee, the Executive Committee, and the Nominating and Corporate Governance Committee and he is the Chairman of the Investment and Finance Committee.

14.     Jeffrey E. Garten is, and has been since 2000, a director of the Company. He is a member of the Compensation and Talent Management Committee and the Medical Affairs Committee.

15.     Fernando Aguirre is, and has been since 2011, a director of the Company.  He is a member of the Audit and Nominating and Corporate Governance Committee.

16.     Molly J. Coye is, and has been since 2005, a director of the Company.  She is the Chair of the Medical Affairs Committee and a member of the Executive and Investment and Finance Committee.

17.     Richard J. Harrington is, and has been since 2008, a director of the Company.  He is the Chairman of the Audit Committee and a member of Executive, Investment and Finance and Medical Affairs Committees.

18.     Joseph P. Newhouse is, and has been since 2001, a director of the Company.  He is a member of the Audit and Medical Affairs Committees of the Board.

19.     Roger N. Farah is, and has been since 2007, a director of the Company.  He is the Chairman of the Compensation Committee, and a member of the Executive and Investment Finance Committees.

20.     Olympia J. Snowe is, and has been since 2014, a director of the Company.  She is a member of the Audit and Medical Affairs Committees.

21.     The individuals listed in paragraphs 10 through 20, above, are referred to herein as the "Individual Defendants" and, collectively with Aetna, as "Defendants."

**JURISDICTION AND VENUE**

22.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges

violations of Section 14(a) and 20(a) of the Exchange Act.

23.     This Court has jurisdiction over the Defendants because each Defendant is either

a corporation that conducts business in and maintains operations within this District, or is an

individual director of Aetna with sufficient minimum contacts with this District so as to make the

exercise of jurisdiction by this Court permissible under traditional notions of fair play and

substantial justice.  In 1996, Aetna acquired U.S. Healthcare, which was formerly headquartered

in Blue Bell, Pennsylvania, and has continued since that time to conduct significant business in

this District and to maintain one of the Company's two corporate offices at 1425 Union Meeting

Road, Blue Bell, PA 19422.

24.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C.

§ 78aa, as well as under 28 U.S.C. § 1391, because: (i) the Plaintiff is a resident in this District;

(ii) the conduct at issue had an effect in this District; and (iii) Aetna is incorporated in this

District.

**CLASS ACTION ALLEGATIONS**

25.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of

himself and the other public stockholders of Aetna (the "Class").  Excluded from the Class are

Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated

with any Defendant.

26.     This action is properly maintainable as a class action because:

7

a)      the Class is so numerous that joinder of all members is impracticable. As of December 28, 2017, there were approximately 326.7 million shares of Aetna common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country;

b)      there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.      whether Defendants misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

ii.      whether the Individual Defendants have secondary liability under Section 20(a) of the Exchange Act; and

iii.      whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially misleading and incomplete S-4.

c)      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in this type of litigation and will fairly and adequately protect the interests of the Class;

d)      Plaintiff's claims are typical of the claims of the other Class members and Plaintiff does not have any interests adverse to the Class;

e)      the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the party opposing the Class;

f)      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g)      a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.      Background

27.     Aetna, which was founded in 1853 and incorporated in 1982, is a diversified healthcare benefits company that operates through three segments (Health Care, Group Insurance, and Large Case Pensions) in the United States.   The Company offers a range of traditional, voluntary and consumer-directed health insurance products and related services, including medical, pharmacy, dental, behavioral health, group life and disability plans, medical management capabilities, Medicaid healthcare management services, Medicare Advantage and Medicare Supplement plans, workers' compensation administrative services and health information technology products and services. Aetna has represented that as of September 30, 2017, it serves an estimated 44.6 million people.

28.     Prior to the announcement of the Proposed Transaction, Aetna was poised for significant future, long-term growth.   Reflecting this strength, Aetna's shares had gained 46 percent in 2017 through the close of markets on December 1, 2017, the last close before the public announcement of the Proposed Transaction.

29.     On September 18, 2017, Zacks Investment Research – a website that provides investors with financial data and analysis – highlighted that Aetna's strong business was well poised for long term growth.  It noted that over the last four quarters, Aetna had surpassed estimates with an average positive earnings surprise of 19%.  As Zacks further noted, the Company's common stock had gained 31.2% in the last nine months before the announcement of the Proposed Transaction, outperforming the industry's growth of 27%, and Aetna's trailing 12 month return on equity ("ROE") of 20.5% reinforced its growth potential.  Indeed, its ROE increased in the past three years and is higher than ROE of 19% for the industry.[1]

30.     On October 31, 2017, Aetna announced its results for the third quarter 2017.  The Company announced net income of $838 million, or $2.52 per share, which was an increase of $234 million from the prior year's third quarter net income of $604 million.  The Company's adjusted earnings were $814 million, or $2.45 per share, compared with $734 million from previous year's third quarter.  Aetna also substantially outperformed analysts' consensus expectations, which were that the Company's earnings would be $2.06 per share.  Thus, by any measure, the Company's third quarter results far exceeded the market's expectations and were substantially ahead of the previous year's third quarter results.[2]

**II.     The Announcement of the Proposed Transaction**

31.     On December 3, 2017, Aetna and CVS issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

---

[1] *5 Reasons Why You Should Buy Aetna's (AET) Stock Right Now*, ZACKS (Sept. 18, 2017), *available at* https://www.zacks.com/stock/news/276175/5-reasons-why-you-should-buy-aetnasaet-stock-right-now.

[2] *Aetna (AET) Tops Q3 Earnings Estimates, Raises 2017 Guidance*, ZACKS (Oct. 31, 2017), *available at* https://www.zacks.com/stock/news/280987/aetna-aet-tops-q3-earnings-estimatesraises-2017-guidance.

### CVS Health to Acquire Aetna

CVS Health (NYSE: CVS), a company at the forefront of changing the health care landscape, and Aetna (NYSE: AET), one of the nation's leading diversified health care benefits companies, today announced the execution of a definitive merger agreement under which CVS Health will acquire all outstanding shares of Aetna for a combination of cash and stock. Under the terms of the merger agreement, which has been unanimously approved today by the boards of directors of each company, Aetna shareholders will receive $145.00 per share in cash and 0.8378 CVS Health shares for each Aetna share. The transaction values Aetna at approximately $207 per share or approximately $69 billion. Including the assumption of Aetna's debt, the total value of the transaction is $77 billion.
This transaction fills an unmet need in the current health care system and presents a unique opportunity to redefine access to high-quality care in lower cost, local settings—whether in the community, at home, or through digital tools.

CVS Health President and Chief Executive Officer Larry J. Merlo said, "This combination brings together the expertise of two great companies to remake the consumer health care experience. With the analytics of Aetna and CVS Health's human touch, we will create a health care platform built around individuals. We look forward to working with the talented people at Aetna to position the combined company as America's front door to quality health care, integrating more closely the work of doctors, pharmacists, other health care professionals and health benefits companies to create a platform that is easier to use and less expensive for consumers."

This is a natural evolution for both companies as they seek to put the consumer at the center of health care delivery. CVS Health has steadily become an integrated health care company, and Aetna has moved beyond being a traditional insurer to focus more on consumer well-being.

"This is the next step in our journey, positioning the combined company to dramatically further empower consumers. Together with CVS Health, we will better understand our members' health goals, guide them through the health care system and help them achieve their best health," said Mark T. Bertolini, Aetna chairman and CEO. "Aetna has a proud tradition of continually innovating to address unmet consumer needs and providing leading products and services to the marketplace."

Bertolini continued, "Aetna has a talented and dedicated group of employees working to build a healthier world every day. Our combined company will be more competitive in the marketplace and accelerate progress toward achieving this mission."

Today, increasing numbers of consumers are taking on more and more responsibility for paying for their health care as the burden of costs is being

shifted to them. Together, CVS Health and Aetna will be a trusted community partner who will help consumers better manage the cost of the health care they need. The combined company will also be well positioned to more effectively meet the health needs of many more people, especially the 50 percent of Americans with chronic conditions that account for more than 80 percent of all health care costs. Finally, capabilities developed following this transaction will directly benefit clients of both companies and enable them to better manage their health care costs.

## BENEFITS FOR CONSUMERS

### Uniquely Integrated, Community-Based Health Care Experience

Consumers will benefit from a uniquely integrated, community-based health care experience. The combined company will also be able to better understand patients' health goals, guide them through the health care system, and help them achieve their best health. There will be expanded opportunities to bring healthcare services to consumers every day. CVS Pharmacy locations will include space for wellness, clinical and pharmacy services, vision, hearing, nutrition, beauty, and medical equipment, in addition to the products and services our customers currently enjoy. An entirely new health services offering available in many locations will function as a community-based health hub dedicated to connecting the pathways needed to improve health and answering patients' questions about their health conditions, as well as prescription drugs and health coverage.

This personalized health care experience will be delivered by connecting Aetna's extensive network of providers with greater consumer access through CVS Health. This includes more than 9,700 CVS Pharmacy locations and 1,100 MinuteClinic walk-in clinics—as well as further extensions into the community through Omnicare's senior pharmacy solutions, Coram's infusion services, and the more than 4,000 CVS Health nursing professionals providing in-clinic and home-based care across the nation. As a result, there will be a better opportunity to utilize local care solutions in a more integrated fashion with the goal of improving patient outcomes.

### More Integrated Data and Analytics

The entire health care system will also benefit from broader use of data and analytics, leading to improved patient health at substantially lower cost. This will be achieved, for example, by helping patients avoid unnecessary hospital readmissions. Twenty percent of Medicare patients are readmitted to the hospital soon after being discharged at significant annual costs, much of which is avoidable. Readmission rates can be cut in half if patients have a complete review of their medications after discharge from the hospital to help them manage their care at home. In addition, home devices to monitor activity levels, pulse, and respiratory rates can be used to prevent readmissions. Rather than feeling lost and

confused, selected high risk patients discharged from the hospital, or their caregivers, will be able to stop at a health hub location to access services such as medication evaluations, home monitoring and use of durable medical equipment, as needed. All of these services will complement and be integrated with the care provided by their physician and medical team.

**Opportunity to Better Fight Chronic Disease**

The combined entity will be able to help address the growing cost of treating chronic diseases in important ways. For example, there are 30 million Americans suffering from diabetes, costing the health care system approximately $245 billion annually. Patients with diabetes will receive care in between doctor visits through face-to-face counseling at a store-based health hub and remote monitoring of key indicators such as blood glucose levels. When needed, patients can receive text messages to let them know when their glucose levels deviate from normal ranges. As a follow up, patients can receive counseling on medication adherence, pick up diabetes-related supplies and engage ancillary services such as counsel on weight loss and programs designed to reverse diabetes through nutrition. This will result in better control of their blood sugar levels and better health, which should be appreciated by both patients and their doctors.

"These types of interventions are things that the traditional health care system could be doing," commented Merlo, "but the traditional health care system lacks the key elements of convenience and coordination that help to engage consumers in their health. That's what the combination of CVS Health and Aetna will deliver."

## BENEFITS FOR SHAREHOLDERS

As a result of this transaction, shareholders are expected to benefit from a number of outcomes, including enhanced competitive positioning; low- to mid-single digit accretion in the second full year after the close of the transaction, including the ability to deliver $750 million in near-term synergies; and a platform from which to accelerate growth. The combination over the longer term has the potential to deliver significant incremental value as it will spur the development of new products and generate significant new growth opportunities as a uniquely integrated retailer, pharmacy benefits manager and health plan. Aetna shareholders will receive attractive value from the transaction, including $145 per share in cash, and the ability to participate in the future success and high growth potential of the combined company.

## TRANSACTION DETAILS

### Transaction Terms

Under the terms of the merger agreement, each outstanding share of Aetna common stock will be exchanged for $145.00 in cash and 0.8378 shares of CVS Health common stock. Upon closing of the transaction, Aetna shareholders will own approximately 22% of the combined company and CVS Health shareholders will own approximately 78%.

The transaction is expected to close in the second half of 2018. It is subject to approval by CVS Health and Aetna shareholders, regulatory approvals and other customary closing conditions.

### Financing of the Transaction

CVS Health intends to fund the cash portion of the transaction through a combination of existing cash on hand and debt financing. The transaction is not contingent upon receipt of financing. Barclays, Goldman Sachs and Bank of America Merrill Lynch are providing $49 billion of financing commitments.

### Governance Details

Upon the closing of the transaction, three of Aetna's directors, including Aetna's Chairman and CEO Mark T. Bertolini, will be added to the CVS Health Board of Directors. In addition, members of the Aetna management team will play significant roles in the newly combined company. Aetna will operate as a stand-alone business unit within the CVS Health enterprise and will be led by members of their current management team.[3]

32.     The $207 deal price represents a 30 percent premium to Aetna's share price on October 25, 2017, the day before the companies were reported to be in talks on a potential deal, and a 14 percent premium to the price of Aetna the day before the deal was announced. However, it fails to fully reflect the Company's fair value in light of the Company's demonstrated industry value and growth in 2017, the fact that it was poised for significant long-term growth, and the subsequent passage of the Tax Cuts and Jobs Act of 2017.

---

[3] CVS Health Corporation, Current Report (Form 8-K), at Exhibit 99.1 (Press release dated December 3, 2017, "CVS Health to Acquire Aetna") (Dec. 3, 2017).

14

33.     Analysts have expressed that the Merger Consideration is too low.  Michael Wiederhorn, an analyst at Oppenheimer, said that while the deal has a "risky integration process," Aetna shareholders should be paid more for their shares.  He stated that the Proposed Transaction "is more beneficial to CVS given the competitive pressures and need to take action," and that "Aetna was in the driver's seat and should have received a higher premium."  In a research note authored by Sarah James, Piper Jaffray stated that Aetna could be valued at the higher end of Piper Jaffray's sum-of-the-parts valuation of $218 per share given the positive industry backdrop and Aetna's estimated growth rate.  Raymond James further opined that Aetna stockholders should have gotten "heavier cash and a higher price point."  And JPMorgan's Gary Taylor noted that the $207 per share takeover price "may be viewed as insufficient by some AET shareholders given a possible 24% EPS benefit to AET from tax reform."  Taylor also noted that the premium to Aetna's unaffected stock price (*i.e.*, before any public reports of a potential merger between CVS and Aetna) was toward the lower end of expectations.  Given these considerations, including but not limited to the large corporate benefits that Aetna would likely have achieved under the Tax Cuts and Jobs Act, which upon information and belief were not reflected in the Merger Consideration, the Proposed Transaction is not only premised on a materially misleading and incomplete S-4, but it also appears to reflect Merger Consideration that does not provide fair value for Aetna shareholders.

34.     Indeed, key portions of the valuation analyses conducted by the financial advisors retained by Aetna and its Board, Lazard Ltd ("Lazard") and Allen & Company LLC ("Allen"), in their fairness opinions – although lacking in providing key information to investors in the S-4 – also appear to indicate that the Merger Consideration is too low.  For instance, Lazard performed a Discounted Cash Flow ("DCF") Analysis including the application of a perpetuity growth rate

to estimated 2022 free cash flow ("FCF") to estimate terminal value.  Lazard utilized growth rates of 2-3% and a discount rate range of 7-8%.  Based at least in part on management projections provided by Aetna to Lazard, including projections for FCF, as shown in the S-4, Lazard's analysis resulted in an implied value as high as $233 per share.

35.    Allen performed a DCF analysis using the same perpetual growth rates (2-3%) as Lazard, but used a slightly higher discount rate range of 7-8.5%.  The result of Allen's analysis was an implied value as high as $231 per share – also well above the $207 per share Merger Consideration.

36.    Moreover, as detailed below, the Company's public common shareholders should be provided with sufficient financial and other information in the S-4 to make an informed decision regarding the Proposed Transaction and the fairness of the Merger Consideration.

### III.    The Merger Agreement Contains Unreasonable and Preclusive Deal Protection Provisions that Deter Superior Offers

37.    On December 3, 2017, Defendants filed the Merger Agreement with the SEC.  In addition to agreeing to inadequate consideration for Aetna shares, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement, which all but ensure the consummation of the inadequate deal with CVS to the detriment of Aetna's public stockholders.

38.    First, the Merger Agreement contains a "no solicitation" provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal price for Aetna shareholders.  Section 6.02 of the Merger Agreement generally states that the Company and the Individual Defendants shall not, among other things: (i) solicit, initiate or take any action to knowingly facilitate or knowingly encourage the submission of any acquisition proposal from any third party, (ii) enter into or participate in any discussions or negotiations with

16

any third party that such party knows is seeking to make, or has made, an acquisition proposal, (iii) fail to make or withdraw or qualify, amend or modify in any manner adverse to the other party the recommendation of such party's board of directors that its shareholders approve and adopt the merger agreement, in the case of Aetna, or its stockholders approve the stock issuance, in the case of CVS Health, or (iv) fail to enforce or grant any waiver or release under any standstill or similar agreement.[4]

39.     Second, under Section 6.03(b) of the Merger Agreement, the Company can only talk with and provide information in response to an unsolicited, bona fide, written acquisition proposal if the Aetna Board determines, in good faith, after consultation with legal and financial advisors, that is has received a "superior proposal" from that bidder.  Even then, the third-party bidder would be required to enter into a confidentiality agreement "with confidentiality terms in the aggregate no less favorable to the Company than those contained" in the confidentiality agreement with CVS.

40.     Third, the Individual Defendants must notify the Company within 24 hours of discovery of any proposals, indications of interest, and/or draft agreements received from other persons making an acquisition proposal under Section 6.02(c) of the Merger Agreement.  *See* Merger Agreement at *69.

41.     Fourth, Section 6.02(d) of the Merger Agreement also places severe restrictions on the ability of the Aetna Board to changes its recommendation on the Proposed Transaction. Specifically, the Aetna Board may not make a recommendation change unless the alternate proposal is a superior offer and Aetna has given CVS at least three days' notice in writing that it

---

[4] Aetna, Inc., Current Report (Form 8-K), at Exhibit 2.1, at *67-71 (Merger Agreement, dated as of December 3, 2017, by and among CVS Health Corporation, Hudson Merger Sub Corp. and Aetna Inc.) (Dec. 3, 2017).

intends to take such action. Moreover, the Aetna Board can only accept an alternate proposal if it has determined, in consultation with its outside legal counsel, that the failure to take such action would be inconsistent with its fiduciary duties under applicable law.

42.     Finally, Section 10.03 of the Merger Agreement provides that Aetna must pay CVS a termination fee of $2.1 billion, representing approximately 2.7% of the approximate deal value to shareholders of $77 billion, if the Aetna decides to pursue a superior proposal, thereby essentially requiring that the alternate bidder agree to pay an unreasonable premium for the right to provide the Company's shareholders with a superior offer. In light of the analyst commentary that the Proposed Transaction "is more beneficial to CVS given the competitive pressures and need to take action" and that "Aetna was in the driver's seat," the termination fee in the amount of $2.1 billion is unreasonably high and strongly discourages any other bidder from coming forward.

43.     These preclusive deal protection provisions restrain Aetna's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company and all but guarantee that there will be no alternatives provided to Aetna shareholders other than the Proposed Transaction with CVS.

44.     Accordingly, it becomes all the more imperative that Aetna's stockholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Transaction.

**IV.     The Materially Misleading and Incomplete Form S-4**

45.     On January 4, 2018, with the consent of the Individual Defendants, the Company filed the S-4 with the SEC to begin the process of soliciting Aetna common stockholders to vote in favor of the Proposed Transaction. The Company and Individual Defendants were obligated

to carefully review the S-4 before it was filed with the SEC and disseminated to Aetna's stockholders to ensure that it did not contain any material misrepresentations or omissions. For the reasons described herein, the S-4 was materially misleading and incomplete, in violation of Sections 14(a) and 20(a) of the Exchange Act, because it omitted information that is necessary for Aetna's shareholders to make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

### *Material Omissions Concerning the Background of the Proposed Transaction*

46.     The Background of the Merger section of the S-4 omits material information critical to Aetna's stockholders regarding the Proposed Transaction. Without this information, Aetna's stockholders will not be able to cast an informed vote on the Proposed Transaction.

47.     The Background of the Merger section states: "Starting in September 2016, members of Aetna's management also met from time to time with representatives of Aetna's financial advisors, Lazard and Allen & Company, to discuss Aetna's business and potential strategic opportunities, including potential opportunities with companies in the retail industry." S-4 at 90. The S-4, however, fails to disclose when Aetna engaged these financial advisors and in what capacity, and also fails to disclose any detail regarding these discussions.

48.     The S-4 indicates that the initial offer by CVS for Aetna "consist[ed] of approximately 55% in cash and 45% in shares of CVS Health common stock." S-4 at 93. The increased cash portion of consideration was also discussed by the CVS board at meetings on November 7 and 8, 2017, but there is no reason given for the increase in cash and decrease in stock. S-4 at 95. The S-4 also states: "On November 11, 2017, representatives of Aetna and CVS Health and their respective advisors met for a diligence presentation by Aetna management. At this meeting, Mr. Denton conveyed CVS Health's revised proposal to increase the cash

component of the proposed purchase price to approximately 70%, with the remaining 30% to be paid in shares of CVS Health common stock." *Id.* Again, however, the S-4 does not provide a reason why the proposal was revised to increase the cash component of the Merger Consideration and decrease the stock component.

49.     The S-4 discusses the special meeting of the Aetna board of directors held on November 14, 2017. S-4 at 95-96. Specifically, the S-4 states: "The board of directors discussed the advantages and disadvantages of Aetna exploring strategic alternatives with CVS Health or other companies with retail pharmacy operations as opposed to continuing to operate as a stand-alone company." S-4 at 96. The S-4, however, contains no further description of the advantages or disadvantages of remaining a stand-alone company, and does not disclose what strategic alternatives were discussed in addition to a merger of the two companies. These details are important for a shareholder of Aetna to consider in determining whether the Proposed Transaction is in his, her or its best interest. The lack of these disclosures renders the S-4 materially misleading and incomplete.

### *Material Omissions Concerning Lazard's Financial Analyses*

50.     The S-4 describes Lazard's fairness opinion, including the various valuation analyses it performed to support its opinion that the Proposed Transaction was fair from a financial viewpoint to Aetna's stockholders. As described below, the description of Lazard's fairness opinion and analyses in the S-4 fails to include many key inputs and assumptions underlying the analyses. Without this data, Aetna's stockholders cannot replicate Lazard's analyses and are therefore unable to fully understand these analyses and determine what, if any, weight they should give Aetna's fairness opinion in determining whether to vote in favor of the

Proposed Transaction.   Disclosing this information would significantly alter the total mix of information available to Aetna's stockholders.

51.     The S-4 discloses that Lazard performed a DCF analysis of Aetna by calculating, based on management's forecasts, the estimated present value (as of December 31, 2017) of the stand-alone unlevered, after-tax free cash flows that Aetna was forecasted to generate during the fiscal year ending December 31, 2018 through the fiscal year ending December 31, 2022. The S-4 further discloses that for purposes of this analysis, stock-based compensation was treated as a cash expense. *See* S-4 at 114.  However, there is no such disclosure related to management's projections.   To the extent that FCF projections used by Lazard have been adjusted from the forecasts supplied by management, they should be disclosed in the S-4.

52.     In the S-4, the FCF projections provided by management decline from $3.5 billion in 2018 to $2.5 billion in 2020, and then recover somewhat to $3.0 billion in 2022.  S-4 at 156. However, the S-4 states that earnings before interest, tax, depreciation, and amortization ("EBITDA") and earnings per share ("EPS") are projected to grow 9 percent and 12 percent, respectively, from 2017 to 2022, but there will be a 3 percent decline in cash flows.  There is no explanation for this projected decline in cash flows (for instance, the S-4 does not disclose any projected large cash outlays that may be inherent in management's projection), or for the impact the projected decline had on Lazard's DFC.  Therefore, the S-4 is materially incomplete and/or misleading.

53.     With respect to Lazard's *Selected Precedent Transactions Analysis* and *Selected Public Companies Analysis*, the S-4 also fails to include necessary detail.  Lazard performed a public companies analysis using EPS and EBITDA multiples from four other insurance companies:  Anthem, Inc.; Cigna Corporation; Humana Inc.; and UnitedHealth Group

Incorporated.  Lazard determined that the range of price/earnings multiples to estimated EPS for the comparable public companies was 18-21.4x, with a mean of 19.6x.  S-4 at 115.  Lazard then "selected" a range of 17-19x to apply to estimated EPS for Aetna.  This range starts below the range for Aetna's peers and does not offer any appreciable upside.  The S-4 fails to provide an explanation as to why Aetna is valued at such a discount, and is highly deficient in this regard.

54.     The S-4 further fails to include the individual multiples Lazard calculated for each company transaction it used in its *Selected Precedent Transactions Analysis* and *Selected Public Companies Analysis*.  The omission of these multiples renders the summary of these analyses in the S-4 and the implied equity value reference ranges materially misleading.   A fair summary of Selected Precedent Transactions Analysis and Selected Public Companies Analysis requires the disclosure of the individual multiples for each company and transaction.  The range the banker applied is not sufficient and without the individual multiples, Aetna shareholders are unable to determine whether Lazard applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.  *See* S-4 at 115-116.

55.     Lazard's selected public companies analysis results in an implied value of $170-$190 per share, which is below the Merger Consideration.  However, as shown above, the range that Lazard selected for its EPS multiple – without any explanation – was significantly below the range of the peer companies selected for this analysis.  The S-4 is materially misleading and incomplete because (a) it fails to present the criteria utilized by Lazard to select Aetna's purported peer group and (b) it fails to explain why the range that Lazard selected for this analysis (17-19x) was significantly below the comparable public companies' EPS multiple range of 18-21.4x, and even below the mean for the comparable public companies' EPS multiple of 19.6x.

56.     Lazard presented a similar analysis focusing on 2018 EBITDA multiples.  The range for peer companies used was 10.2-12.7x, with a mean of 11.4x.  Lazard used 10-12x for this portion of its comparable public companies' analysis, which is represented in the S-4 to have resulted in an implied value per share of $163 to $200.  However, the S-4 fails to explain why Lazard selected those multiples.  Moreover, calculating equity value using EBITDA multiples requires that debt be subtracted and cash and equivalents be added to the equation.  Using Aetna's September 30, 2017 balance sheet numbers, the application of a 10-12x multiple to the Company's estimated 2018 EBITDA of $6.2 billion results in a per share value of $180 to $216 – not the $163 to $200 stated in the S-4.  While this discrepancy may be the result of whether or not Lazard included Aetna's short-term investments in cash and equivalents (and noting that Bloomberg includes these inputs in its calculation of Enterprise Value), the S-4 is materially deficient because it fails to disclose the debt, cash and equivalents, and share count that Lazard used in this analysis.  Without this necessary, material information, there is no way for an Aetna stockholder to replicate Lazard's analyses, thereby undermining the ability of Aetna shareholders to determine the fairness of the Merger Consideration and, ultimately, whether to vote in favor of the Proposed Transaction.

57.     Lazard performed a Precedent Transactions analysis, analyzing 7 prior industry transactions between 2011 and 2017.  The S-4 states: "Using publicly available information, Lazard reviewing financial information relating to the following seven selected transactions…" S-4 at 116.  The S-4, however, fails to disclose the criteria that Lazard used to identify its comparable transactions.  Without this information, Aetna's stockholders cannot determine the accuracy of this analysis or the weight that it should be accorded in determining whether the Merger Consideration is fair and in determining whether to vote for the Proposed Transaction.

58.     The S-4 is also materially misleading and incomplete because it fails to include any analysis of the premiums paid in Lazard's precedent industry transactions analysis.

59.     On page 112, the S-4 states: "At Aetna's direction, for purposes of Lazard's analysis, Lazard utilized projected synergies and other benefits anticipated to be realized from the merger that were prepared by Aetna."  Although the press release issued on December 3, 2017 stated they would be approximately $750 million in near-term synergies from the Proposed Transaction, the S-4 fails to disclose the amount of the expected synergies and benefits (near-term and/or longer-term), and further fails to disclose or explain sufficiently which analyses reflected expected synergies and the details underlying any such analyses and expected synergies.

### Material Omissions Concerning Allen's Financial Analyses

60.     Aetna retained not one, but two financial advisors in connection with the Proposed Transaction, both of whom will receive a significant fee if the Proposed Transaction is consummated.  Allen was retained in addition to Lazard.  Allen's analyses and description of same is nearly identical to Lazard's.  As detailed below, the description of Allen's work underlying its fairness opinion is materially misleading and incomplete in many respects, some of which overlap with the deficiencies relating to disclosures concerning Lazard's fairness opinion.

61.     Allen performed a DCF analysis using the same perpetual growth rates (2-3%) as Lazard, but used a slightly higher discount rate range of 7-8.5% (as compared to 7-8%).  Allen's implied value per share based on its purported DFC analysis ranges from $137 to $231 (as compared to Lazard's DFC analysis that results in a range of $152 to $233).  Like Lazard, Allen also treated stock-based compensation as a cash expense, but Allen similarly failed to disclose

24

how its projections are different from the management projections included in the S-4. In addition, Allen's analysis does not include a DCF using a terminal multiple value.

62.     Allen's *Selected Public Companies Analysis* uses the same four peers as Lazard's analysis: Anthem, Cigna, Humana, and UnitedHealth Group. In fact, the entire Selected Public Company Analysis looks to be a virtual carbon copy of Lazard's. For 2018 EPS, Allen "selected" a range of 18-20x (Lazard selected 17-19x) and for EBITDA, Allen "selected" the same range utilized by Lazard (10-12x) to value Aetna. The implied range of value using EPS multiples is $180 to $200 (compared to Lazard's $170 to $190) and using EBITDA multiples it is $162 to $199 (compared to Lazard's $163 to $200). Thus, it appears that these are not two independent analyses and to the extent the two advisors worked together, that must be disclosed as investors are not benefitting from two independent analyses and fairness opinions.

63.     Further similar to Lazard, Allen's Selected Public Companies Analysis cannot be replicated or verified – and is therefore materially misleading and incomplete – because it fails to disclose the cash and equivalents, debt, and share count numbers utilized in Allen's analyses.

64.     Likewise, Allen's *Precedent Transaction Analysis* used the same 7 transactions as Lazard, and it likewise did not set forth the search criteria it used. This analysis also uses the exact language as the Lazard section: "Using publicly available information, Allen & Company reviewed financial information relating to the following seven selected transactions…" For the same reasons as set forth above, the portion of the S-4 that discusses Allen's Precedent Transaction Analysis is similarly materially misleading and incomplete in that it omits necessary information.

65.     Allen also calculated LTM EBITDA multiples, with a mean and median of 11.7x and 12.6x. Allen "selected" a range of EBITDA multiples for Aetna of 10-13x (Lazard had

25

"selected" 11-13x) arriving at implied value of $167 to $224. Allen also looked at forward EBITDA multiples based on 2018 estimated EBITDA. The mean and median were represented to be 7.2-12.3x. Allen "selected" a range of 9.5-12.5x and applied that to its projected EBITDA for Aetna to arrive at an implied value of $153 to $208.

66.     As noted above, both Lazard and Allen purport to rely on management's projections in the S-4 that were developed in October 2017. As described above, however, they both appear to have made certain "adjustments" to management projections without identifying in the S-4 the reasons for or the scope of their adjustments, and they both also appear to have ignored the benefits that Aetna would have obtained through the tax reform package as it was being developed and as ultimately included in the Tax Cuts and Jobs Act.

67.     Because the S-4 includes management's projections, but not those actually utilized by Lazard and Allen, the S-4 is materially misleading and incomplete because it omits information that would be important to Aetna shareholders in determining whether to tender their shares in the Proposed Transaction. It is further materially misleading and incomplete because it fails to disclose the significant benefits that Aetna might have been entitled to achieve as a result of the Tax Cuts and Jobs Act, and for the many other reasons stated above. Moreover, management's projections were prepared in October 2017, and therefore do not reflect potential advantages of the Tax Cuts and Jobs Act. *See* S-4 at 154. Such deficiencies make it impossible for Aetna's public stockholders to fully understand (and replicate) the analyses summarized in the S-4 as part of Lazard's and Allen's fairness opinions, which undercuts the shareholders' ability to determine what weight, if any, to place on the fairness opinions in determining whether to tender their shares in favor of the Proposed Transaction. This failure further undercuts the public shareholders' ability to determine what weight, if any, to place on the Board's

26

recommendation that Aetna shareholders tender their shares in favor of the Proposed Transaction. The omitted information, if disclosed, would thus significantly alter the total mix of information available to Aetna's public common stockholders.

68.     The omission of the above-referenced information renders the S-4 materially incomplete and misleading in violation of the Exchange Act. Absent disclosure of the foregoing material information prior to the stockholder vote, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

69.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

70.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

71.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

72.    Defendants have issued the S-4 to solicit Aetna's common stockholders' support for the Proposed Transaction. Each of the Individual Defendants is purported to have reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, among other things: (i) financial projections for the Company; (ii) the valuation analyses performed by the Company's financial advisors, Lazard and Allen, in support of their fairness opinions; and (iii) the background process leading to the Proposed Transaction.

73.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of the Company, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4, but nonetheless failed to obtain and disclose such information to Aetna's common stockholders although they could have done so without extraordinary effort.

74.    The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants are purported to have reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the S-4 states that Lazard and Allen reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Lazard and Allen, as well their fairness opinions and

28

the assumptions made and matters considered in connection therewith. Further, by virtue of their roles with the Company, the Individual Defendants were privy to and had knowledge of the projections for Aetna and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified herein has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review the analyses provided by Lazard and Allen in connection with their receipt of the fairness opinions, and had the ability to question Lazard and Allen as to the bases for the fairness opinions. Accordingly, the Individual Defendants (and the Company) were obligated to be attentive to the procedures followed in preparing the S-4, and to review it carefully before it was disseminated to the public stockholders, to corroborate that there are no material misstatements or omissions.

75.     At minimum, the Individual Defendants were negligent in preparing and reviewing the S-4. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as directors of the Company.

76.     Aetna is also negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4, and to the extent that Aetna further relied on the Company's management or advisors with respect to the S-4.

77.     The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and

omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

78.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

79.     As alleged herein, the Individual Defendants acted as controlling persons of Aetna within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions as officers and/or directors of the Company, and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements regarding the Proposed Transaction that Plaintiff contends are materially incomplete and misleading.

80.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the S-4 and other statements alleged by Plaintiff to be materially misleading and incomplete prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

81.     In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transaction giving rise to the Exchange Act violations

alleged herein, and exercised the same.  The S-4 at issue contains the recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

82.     In addition, as set forth in the S-4 and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered when agreeing to the Proposed Transaction.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

83.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

84.     As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

85.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the common shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

31

C.     Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages in the event the Proposed Transaction is consummated;

D.     Directing Aetna and the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of Aetna's and the Individual Defendants' wrongdoing;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 25, 2018

**BARRACK, RODOS & BACINE**

By: _____
Jeffrey W. Golan
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 963-0600
Fax: (215) 963-0838

*Attorneys for Plaintiff*
*Robert Freedman*

32